UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HIT & MISS, ENTERPRISES, INC., a California corporation; SAMI AMMARI,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF LONG BEACH,<br><br>Defendant. | CASE NO. 2:18-cv-09996-WLH-SSC<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL; ORDER** |

Plaintiffs Hit & Miss Enterprises, Inc. and Sami Ammari (collectively, "Plaintiffs") brought this action against Defendant City of Long Beach ("Defendant") on October 23, 2018, in the Superior Court of California for the County of Los Angeles. (Notice of Removal, Docket No. 1). Plaintiffs alleged, in short, that Defendant violated the First and Fourteenth Amendments by seizing Plaintiffs' trailers because they bore advertisements in apparent violation of § 10.18.050 and § 21.54.125 of the Long Beach Municipal Code; prosecuting Plaintiff Ammari under those ordinances; and refusing to provide Plaintiffs with post-impound hearings. (First Am. Compl. ("FAC"), Docket No. 18). In the FAC, Plaintiffs brought three claims, for (1) injunctive and declaratory relief pursuant to the First and Fourteenth Amendments; (2) *Monell* liability under 42 U.S.C. § 1983; and (3) violation of the Bane Act, California Civil Code § 52.1.

Defendant removed the action to this Court on November 29, 2018. (*Id.*). On January 6, 2021, the Court issued an order on the parties' cross-motions for summary judgment, granting Plaintiffs' motion for partial summary judgment and granting in part Defendant's motion for summary judgment (the "MSJ Order," Docket No. 40).[1] The Court found that the ordinances at issue could not survive strict scrutiny and therefore were invalid as violating the First Amendment. (*Id.* at 4–6). The Court thus granted summary judgment for Plaintiffs on the First Amendment claims in their first cause of action for declaratory and injunctive relief. (*Id.* at 6). The Court denied Defendant's summary judgment motion as to Plaintiffs' due process claims in their first cause of action. (*Id.* at 6–7). Finally, the Court granted summary judgment for Defendant as to Plaintiffs' second cause of action under *Monell* and third cause of action for violation of the Bane Act because Plaintiffs failed to oppose Defendant's arguments as to those claims. (*Id.* at 7). "Accordingly," the Court wrote, "the only claim that remains before the Court is the due process portion of Plaintiffs' first cause of action." (*Id.* at 8).

---

[1] This case was previously assigned to Hon. Philip S. Gutierrez before it was transferred to this Court on May 19, 2023. (Transfer Order, Docket No. 85).

The action proceeded as a bench trial before Honorable Wesley L. Hsu in the above-captioned court on January 9, 2024, and January 10, 2024. The Court held a summation hearing on April 10, 2024. Having considered the arguments of the parties and the evidence and testimony presented at trial, the Court makes the following findings of fact and conclusions of law.

## I.     REMAINING ISSUES

After trial, the parties filed briefing in which they dispute which issues remained at trial. (*See* Def.'s Summation Br., Docket No. 112; Pls.' Reply to Summation Br., Docket No. 115). The Court therefore clarifies the remaining issues.

Pursuant to the Court's MSJ Order, "... the only claim that remains before the Court is the due process portion of Plaintiffs' first cause of action." (MSJ Order at 8). In the Final Pretrial Conference Order (the "FPTC Order," Docket No. 102), however, the parties stipulated that the following issues remained to be tried:

> 1. Did Defendant's interference with Plaintiffs' exercise of their First Amendment rights cause Plaintiffs damages?
>
> 2. Did Defendants denial of statutorily mandated impound hearings related to the seizure of Plaintiffs property violate Plaintiffs' rights to due process?
>
> 3. What are the nature and extent of Plaintiffs' damages?

(FPTC Order at 5). The FPTC Order also expressly stated that it "shall supersede the pleadings and govern the course of the trial of this case." (*Id.* at 9).

During the second day of trial on January 10, 2024, while resting their case, Plaintiffs withdrew their due process claim (Trial Tr. of Jan. 10, 2024, Docket No. 110 at 76:23–24). Defendant now argues that, because the MSJ Order stated the due process claim was "the only claim that remains," Plaintiffs dismissed their sole remaining claim at trial and may not recover anything. (*See* Def.'s Summation Br. at 1–3).

That is not so. As Plaintiffs point out, nothing in the MSJ Order prevented Plaintiffs from seeking damages as to Defendant's First Amendment violations.

3

Moreover, the FPTC Order—which Defendant submitted jointly with Plaintiffs and which the Court adopted—defined the remaining issues to include First Amendment damages, and it explicitly superseded the pleadings in this case. Plaintiffs are therefore correct that their claim for damages remained. (*See* Pls.' Reply to Summation Br. at 5–6 (citing *Nw. Acceptance Corp. v. Lynnwood Equip., Inc.*, 841 F.2d 918, 924 (9th Cir. 1988) ("'A pretrial order has the effect of amending the pleadings,' and 'controls the subsequent course of action in the litigation.'") (citations omitted); *999 v. C.I.T. Corp.*, 776 F.2d 866, 870 & n. 2 (9th Cir. 1985) ("CIT failed to raise mitigation of damages as an affirmative defense in its pleadings, which ordinarily would constitute a waiver of that defense. However, the issue of mitigation was included in the pre-trial order, which has the effect of amending the pleadings.")).

As such, the remaining issues for trial were (1) whether Defendant's interference with Plaintiffs' exercise of their First Amendment rights caused Plaintiffs damages and, if so, (2) the nature and extent of those damages. The Court makes the following findings of fact and conclusions of law as they pertain to those issues.

## II.  STIPULATED FACTS

The parties stipulated to the following facts in the FPTC Order, which facts were received in evidence without objection:

1. At all times relevant to the incident in question, Defendant's agents, servants, actors, and employees acted under color of law.

2. At all times relevant to the incident in question, Defendant's agents, servants, actors, and employees acted within the scope and course of their employment with the City of Long Beach.

3. At various dates between May and September 2017, Plaintiff Ammari acquired possession and ownership [of] Hit & Miss, Inc.'s storage trailers and put them to use in the operation of Ammari's cleaning and janitorial businesses within and without the City of Long Beach. The trailer stored and

transported cleaning equipment and supplies and carried advertising signs and were "wrapped" to communicate Ammari's cleaning business.

4. Starting in 2017, Plaintiff Ammari lawfully parked his storage trailers on public rights of way in the City of Long Beach.

5. Defendant City, by its agents and employees, commenced to cite and impound Plaintiff Ammari's storage trailers on the ground that they exceeded parking in one place within the City in excess of 72 hours.

6. Plaintiff Ammari discovered the storage vehicles had been seized removed (sic) by employees of the City of Long Beach and demanded their return.

7. Plaintiffs tracked down [their] property to a City of Long Beach Tow Yard on Willow Street in Long Beach and paid money to get them back.

8. Plaintiff Ammari reached out to the City of Long Beach in protest of the trailer seizures and demanded immediate hearings under California Vehicle Code § 22852 to contest the lawfulness of Defendant City's continued seizures. The hearings were refused on the ground that no hearings were required.

9. Plaintiff Ammari continued to park his trailers lawfully in response to the seizures based on alleged 72-hour parking violations by moving the trailers to avoid being penalized under the 72-hour rule.

10. Defendant City, and Deputy City Attorney Green in particular, orchestrated an effort against Plaintiff Ammari to thwart his relocation of trailers so as to be compliant with that law by switching from alleged parking enforcement to alleged advertising violations under the Long Beach Municipal Code, targeting the protected content of Plaintiffs' messages, signage, and advertising on said trailers in accordance with the First Amendment to the Federal Constitution.

11. Plaintiff Ammari continued to protest the City's repeated seizures to no avail.

12. Commencing on May 18, 2018, through May 21, 2018, Defendant's

5

employees and agents, acting on the direction of Deputy City Attorney Green, caused the seizure of 8 allegedly offending trailers on the grounds that Long Beach Municipal Code sections 10.18.050 and 21.54.125 prohibited mobile billboards in public places.

13. On December 28, 2018, Douglas Haubert, City of Long Beach City Prosecutor, wrote to Plaintiff Ammari to announce the City of Long Beach had opened a criminal complaint under Case Number 8LB05997 alleging 9 violations of Long Beach Municipal Code sections 3.80.210, 21.38.210, 21.44.900(A), 3.80.210, 21.32.110, 21.44.900(A), 3.80.210, 21.52.210(A), and 21.44.400c. Haubert directed Plaintiff Ammari to appear for arraignment on January 9, 2019.

14. On February 25, 2019, Defendant City of Long Beach by Deputy City Prosecutor Calvin George caused the filing of an amended criminal complaint 9LB00943 alleging 6 additional violations of LBMC 3.80.210, 21.44.600(H), 21.54.125(a), 380.210, 21.44.600(H), and 21.54.125(a).

15. On February 27, 2019, Deputy City Prosecutor George filed a 3rd misdemeanor complaint in case number 9LB00984 alleging 9 violations of LMMC 3.80.210, 21.44.600(H), [and] 21.54.125(A).

16. Plaintiff Ammari appeared with retained private counsel at his arraignments on February 27, 2019, and March 11, 2019, and denied the charges.

17. On April 24, 2019, Defendant City reached an agreement with Plaintiff Ammari that if a Court invalidated the application of LBMC §21.54.125(A) and §21.44.600(H) as applied to Plaintiff Ammari, the criminal prosecution would be dismissed and earlier *nolo* pleas made pursuant to a Deferred Entry of Judgment agreement would be vacated.

18. On January 6, 2021, this Court granted Plaintiffs' Motion for Summary Judgment on Plaintiffs' §1983 First Amendment deprivation claims based on

       free speech invasions, holding Defendant's enforcement efforts under §21.54.125(A), §21.44.600(H), and §10.18.050 were content-based as to Plaintiffs and failed to survive strict scrutiny under the First Amendment, citing, *inter alia, Boyer v. City of Simi Valley*, 978 F.3d 618 (9th Cir. 2020).

19. On March 16, 2021, pursuant to agreement, the City caused the dismissal of criminal charges set forth in Case Nos. 8LB05997, 9LB00943 and 9LB00984.

20. On January 6, 2021, the Court denied Defendant's challenges to Plaintiffs' 14th Amendment due process deprivation claims caused by the refusal of Defendant City to abide by Vehicle Code §22852 and the hearings provided by law to challenge the City's impoundment of Plaintiffs' business trailers and vehicles.

(FPTC Order at 3–6).

### III. FINDINGS OF FACT

The Court makes the following findings of fact based on the evidence presented at trial, the facts stipulated to by the parties, and all post-trial briefing, as cited herein.

21. From 1986 to 2016, Plaintiff Ammari's family operated 2 Maids Cleaning as a residential and commercial cleaning business. (Trial Tr. of Jan. 9, 2024, Docket No. 109 at 15:18–24).

22. Plaintiff Ammari was the manager of 2 Maids Cleaning when it sold in 2016. (Pl. Ammari Direct Test., Docket No. 101 ¶ 1).

23. When 2 Maids Cleaning sold, Plaintiff Ammari was "left [with] the region of South Bay and Long Beach," (*id.*), which was a "portion" of the area served by 2 Maids Cleaning. (Trial Tr. of Jan. 9, 2024, at 15:22–24).

24. Plaintiff Ammari then began to operate a cleaning service in the South Bay and Long Beach areas as VIP Maids. (Pl. Ammari Direct Test. ¶ 1).

7

25. Plaintiff Ammari purchased eleven trailers (the "Trailers") from Plaintiff Hit & Miss Enterprises, a company owned and operated by Plaintiff Ammari's family. (First Am. Compl., Docket No. 18 ¶ 4).

26. Plaintiff Ammari used the Trailers to store cleaning products and equipment and to advertise his business. (Pl. Ammari Direct Test. ¶¶ 1–2).

27. By May 21, 2018, Defendant had seized all of the Trailers. (*Id.* ¶ 15; Trial Tr. of Jan. 9, 2024, at 38:21–25).

28. Plaintiff Ammari was unable to get the Trailers back at that point because they were placed in an evidence hold in connection with Defendant's criminal prosecutions of Plaintiff Ammari. (Trial Tr. of Jan. 9, 2024, at 39:14–20).

29. Plaintiff Ammari testified that as of May 21, 2018, he was unable to continue operating VIP Maids because he relied on the Trailers for storage and advertising. (*Id.* at 17:7–22:8).

30. According to Plaintiff Ammari's uncontroverted testimony, Plaintiff Ammari paid $15,000 in attorney's fees and costs to defend the criminal cases Defendant brought against him. (Pl. Ammari Direct Test. ¶ 15).

31. According to Plaintiff Ammari's uncontroverted testimony, as part of the agreement made between Defendant and Plaintiffs' attorneys in April of 2019, Plaintiff Ammari was required to pay a total of $8,118 to the Long Beach Bar Foundation, the Long Beach Community Foundation, and the Long Beach Education Foundation. (*Id.* ¶ 16).

32. After the Court issued its January 6, 2021, MSJ Order deeming Long Beach Municipal Code §§ 21.54.125(A), 21.44.600(H), and 10.18.050 unlawful, Defendant dismissed the criminal cases against Plaintiff Ammari pursuant to the agreement made in April of 2019. (*Id.* ¶ 15).

33. According to Plaintiff Ammari's uncontroverted testimony, Defendant never refunded the $8,118 Plaintiff Ammari was required to pay as part of his April 2019 agreement with Defendant.  (*Id.* ¶ 16).

34. Plaintiff Ammari testified that he attempted to retrieve the Trailers after Defendant dismissed the criminal cases, but that he was unable to retrieve them because three of them had been destroyed and eight of them had been auctioned off.  (*Id.* ¶ 17).

35. According to Plaintiff Ammari's uncontroverted testimony, the loss of the Trailers cost him $69,300.  (*Id.*).

36. Plaintiff Ammari also testified that the replacement cost of the Trailers is $120,553.95.  (*Id.*).

37. Plaintiff Ammari testified concerning his outrage, humiliation, and emotional distress resulting from his prosecution for purported violations of unconstitutional provisions of the Long Beach Municipal Code.  (*Id.* ¶ 18; Trial Tr. of Jan. 9, 2024, at 20:14–22:8).

38. Specifically, Plaintiff Ammari testified that as a result of the loss of his business, his house went into foreclosure, and he had to borrow money from his family in order to prevent the sale.  (Pl. Ammari Direct Test. ¶ 18; Trial Tr. of Jan. 9, 2024, at 20:14–22:8).

39. Among other relief, Plaintiff Ammari seeks compensatory damages for past and future lost profits.

40. Plaintiffs' expert, Roman Garagulagian, Ph.D., provided an expert report and corroborating testimony regarding Plaintiffs' past and future lost profits. (Report of Roman Garagulagian, Ph.D. ("Garagulagian Report"),Trial Ex. 32; Trial Tr. of Jan. 9, 2024, at 54:22–72:19).

41. In preparing his expert report, Dr. Garagulagian reviewed, among other documents, 2016–2017 Profit & Loss Statements for 2 Maids Cleaning (the

"2 Maids Profit & Loss Statements," Trial Ex. 33) and Plaintiff Ammari's handwritten notes listing VIP Maids' monthly income for 2016 ("VIP Maids 2016 Income Records," Trial. Ex. 34).

42. Dr. Garagulagian based his calculations of lost profits on the 2 Maids Profit & Loss Statements. (Garagulagian Report at 2).

43. Specifically, Dr. Garagulagian calculated Plaintiffs' past lost profits by taking the 2017 net income of $176,288 listed on the 2 Maids Profit & Loss Statements and "adjust[ing] the net income by a certain growth rate" provided by the Bureau of Labor Statistics. (*Id.* at 2, 5; Trial Tr. of Jan. 9, 2024, at 59:25–61:19).

44. Based on his calculations, Dr. Garagulagian opined that Plaintiffs' past lost profits totaled $1,136,463. (Garagulagian Report at 1, 5; Trial Tr. of Jan. 9, 2024, at 59:2).

45. To calculate Plaintiffs' future lost profits, Dr. Garagulagian used the same base net income that he used for past lost profits; he then adjusted that base net income for growth over Plaintiff Ammari's statistical work-life expectancy, and discounted that number by 16% to reflect the business's risk of failure. (Garagulagian Report at 1, 6; Trial Tr. of Jan. 9, 2024, at 60:21–63:21).

46. Based on his calculations, Dr. Garagulagian opined that Plaintiffs' future lost profits totaled $1,256,031. (Garagulagian Report at 1, 6; Trial Tr. of Jan. 9, 2024, at 62:8).

47. Dr. Garagulagian did not use VIP Maids' 2016 Income Records to calculate Plaintiffs' lost profits.

48. In fact, Dr. Garagulagian did not use any accountings from VIP Maids, the business Plaintiff Ammari was running at the time the Trailers were seized, to calculate lost profits.

49. Dr. Garagulagian solely used the 2 Maids Profit & Loss Statements to calculate VIP Maids' lost profits as a result of Defendant's seizure of the Trailers, even though, according to Plaintiff Ammari's testimony, VIP Maids operated in only a "portion" of the area served by 2 Maids Cleaning. (Trial Tr. of Jan. 9, 2024, at 15:22–24).

50. Besides the handwritten notes showing VIP Maids' monthly income, Plaintiffs submitted no accounting for VIP Maids, nor did they submit any expert testimony based on VIP Maids' accounting.

## IV. CONCLUSIONS OF LAW

51. The Court has federal question jurisdiction to decide this action brought under the authority of 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331.

52. Venue is proper because the events giving rise to Plaintiffs' claims occurred in Los Angeles County, which is within the Central District of California. *See* 28 U.S.C. § 1391(b).

53. Local governing bodies may be sued directly under 42 U.S.C. § 1983 for monetary relief where, as here, an allegedly unconstitutional action implements or executes an ordinance "officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978).

54. The elements required to be shown as to Plaintiffs' § 1983 claim for violation of Plaintiffs' First Amendment rights under color of state law are framed by Ninth Circuit Manual of Model Civil Jury Instructions, Instruction 9.5, providing (as modified to apply to this case) as follows:

   a. Officials or employees of Defendant City of Long Beach acted under color of state law;

   b. The acts of Defendant's officials or employees deprived the Plaintiffs of their particular rights under the United States Constitution;

11

c. Defendant's officials or employees acted pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of Defendant City of Long Beach; and

d. Defendant's official policy caused the deprivation of Plaintiffs' rights by Defendant's officials or employees; that is, Defendant's official policy is so closely related to the deprivation of Plaintiffs' rights as to be the moving force that caused the ultimate injury.

55. Plaintiffs must also show the following particular elements of a § 1983 claim under the First Amendment, as framed by Ninth Circuit Manual of Model Civil Jury Instructions, Instruction 9.11:

a. Plaintiffs were engaged and intending to continue to engage in a constitutionally protected activity;

b. Defendant's actions against Plaintiffs would chill a person of ordinary firmness from continuing to engage in the protected activity; and

c. Plaintiffs' protected activity was a substantial or motivating factor in Defendant's conduct.

56. All of the requisite elements have been demonstrated by Plaintiffs in this case.

57. First, the subject ordinances, under color of which Defendant's agents and employees acted, were "official policies" of Defendant City of Long Beach. *Cf. Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1279 (10th Cir. 2009) (in denying motion to dismiss *Monell* claim, stating "there is no question that [city ordinances] reflect the 'official policy' of the municipality").

58. Second, as stated in the MSJ Order, the activity that the ordinances were directed to preventing and punishing—the carriage of advertising or other messages on a vehicle—was constitutionally protected expressive speech activity. (*See* MSJ Order at 4–6).

59. Finally, the Court finds the purpose of Defendant's actions against Plaintiffs in seizing the Trailers and initiating criminal cases against Plaintiff Ammari was to chill and punish that protected activity and to coerce Plaintiffs to cease their protected activity within the bounds of the City of Long Beach. The Defendant has essentially admitted as much through its stipulations of fact and has offered no other countervailing motive or justification for its actions against Plaintiffs. (*See, e.g.*, ¶ 10, *infra*).

60. The Court therefore finds that Defendant is directly liable under *Monell* for violation of Plaintiffs' First Amendment rights.

61. A plaintiff who establishes liability for deprivations of constitutional rights actionable under § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. *Borunda v. Richmond*, 885 F.2d 1384, 1389 (9th Cir. 1988); *see also Chalmers v. City of Los Angeles*, 762 F.2d 753, 760 (9th Cir. 1985) ("The purpose of awarding damages in a section 1983 action is to compensate the aggrieved party.").

62. "[C]ompensatory damages [in a § 1983 action] may include not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment of reputation ..., personal humiliation, and mental anguish and suffering.'" *Id.* (quoting, with alterations, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974)).

63. Here, Plaintiffs seek compensatory damages for (1) past and future lost profits, in the amount of $2,392,494 (2) the loss of the Trailers seized by Defendant, in either the value of the Trailers when they were seized ($69,300) or their replacement cost ($120,553.95); (3) the fees Plaintiff Ammari paid for defense counsel in his criminal cases, in the amount of $15,000; (4) the donations Plaintiff Ammari was required to make as part of his April 2019 agreement with Defendant, in the amount of $8,118; and (5) emotional

1     distress, in an unspecified amount.

64. "[W]hen [Section] 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." *Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 306 (1986); *see also Carey v. Piphus*, 435 U.S. 247, 257–58 (1978) ("[O]ver the centuries the common law of torts has developed a set of rules to implement the principle that a person should be compensated fairly for injuries caused by the violation of his legal rights. These rules, defining the elements of damages and the prerequisites for their recovery, provide the appropriate starting point for the inquiry under § 1983 as well.").

65. "Both [the Ninth Circuit] and California state courts have recognized that lost profits are 'necessarily an estimate,' and that their 'amount cannot be shown with mathematical precision.'" *Humetrix, Inc., v. Gemplus S.C.A.*, 268 F.3d 910, 919 (9th Cir. 2001) (citations omitted).

66. Nevertheless, lost profits must be established with "reasonable certainty." *See, e.g.*, *Berge v. Int'l Harvester Co.*, 142 Cal. App. 3d 152, 161–62 (Cal. Ct. App. 1983) (citations omitted) ("Lost profits to an established business may be recovered if their extent and occurrence can be ascertained with reasonable certainty; once their existence has been so established, recovery will not be denied because the amount cannot be shown with mathematical precision."); *accord Sargon Enterprises, Inc. v. Univ. of S. California*, 55 Cal. 4th 747, 774 (2012); Restatement (Second) of Torts § 912 (1979) ("It is desirable that responsibility for harm should not be imposed until it has been proved with reasonable certainty that the harm resulted from the wrongful conduct of the person charged. It is desirable, also, that there be definiteness of proof of the amount of damage as far as is reasonably possible."); *Valenzuela v. City of*

14

*Anaheim*, 29 F.4th 1093, 1104 (9th Cir. 2022) (in § 1983 case, quoting Restatement (Second) of Torts § 912 for proposition that "[t]ort damages should be calculated 'with as much certainty as the nature of the tort and the circumstances permit'").

67. "Historical data, such as past business volume, supply an acceptable basis for ascertaining lost future profits." *Berge*, 142 Cal. App. 3d at 162 (citations omitted).

68. "In some instances, lost profits may be recovered where plaintiff introduces evidence of the profits lost by similar businesses operating under similar conditions." *Id.* (citations omitted).

69. Still, "[t]he plaintiff has the burden to produce the best evidence available in the circumstances to attempt to establish a claim for loss of profits." *S. C. Anderson, Inc. v. Bank of Am.*, 24 Cal. App. 4th 529, 535 (1994).

70. Plaintiffs did not meet their burden to produce the best evidence available in the circumstances to establish their claim for lost profits.

71. Plaintiffs did not provide the best evidence of VIP Maids' income before Defendant seized the Trailers. As discussed above, Plaintiffs provided only Plaintiff Ammari's handwritten notes listing VIP Maids' monthly income for 2016. Plaintiffs did not provide any tax forms, canceled checks, declarations from customers, or other reliable records to support those figures.

72. Even assuming Plaintiff Ammari's records of VIP Maids' income were reliable, Plaintiffs' expert, Dr. Garagulagian, did not rely on those records to establish VIP Maids' lost profits. Rather, Dr. Garagulagian relied on the 2 Maids Profit & Loss Statements.[2] Plaintiff Ammari testified, however, that

---

[2] Additionally, the foundation for these two profit and loss statements was questionable at trial. They were not directly testified to at trial. Instead, Dr. Garagulagian testified that he had been provided those documents by Plaintiff Ammari. There was no testimony under oath, therefore, that those profit and loss statements were signed as true

15

VIP Maids operated in only a "portion" of the area in which 2 Maids operated. Dr. Garagulagian's calculations were therefore not based on "evidence of the profits lost by similar businesses under similar conditions." *See Berge*, 142 Cal. App. 3d at 162–63 ("A plaintiff can rely on data from other enterprises only if she shows they operate under similar conditions, such as in the same area and with the same equipment."); *see also Goodness Films, LLC v. TV One, LLC*, No. CV 12-8688-GW(JEMX), 2014 WL 12594201, at *3 (C.D. Cal. Aug. 28, 2014) ("In this case, it would have been possible to offer lost-profit evidence based on more relevant comparators, a rigorous accounting, or expert testimony fit to the facts and supported by a reliable methodology. Instead, Plaintiffs relied on wildly optimistic and conclusory expert valuations, which, rather than the best evidence available, offer no reasonable basis for realistically assessing Plaintiffs' lost profits.").

73. Because Plaintiffs have not established lost profits with reasonable certainty, the Court does not award damages for lost profits.

74. As for the loss of Plaintiffs' Trailers, "[a]s a general rule the measure of damage for the loss or destruction of personal property is the value of the property at the time of such loss or destruction." *Hand Elecs., Inc. v. Snowline Joint Unified Sch. Dist.*, 21 Cal. App. 4th 862, 870 (1994) (quotation and citation omitted); *see also* Restatement (Second) of Torts § 927 ("When one is entitled to a judgment for the conversion of a chattel or the destruction or impairment of any legally protected interest in land or other thing, he may recover … the value of the subject matter or of his interest in it at the time and place of the conversion, destruction or impairment.").

75. The Court therefore awards Plaintiffs **$69,300**, the value of the Trailers when they were seized.

---

and accurate under penalty of perjury.

16

76. Additionally, the Court accepts Plaintiff Ammari's uncontroverted testimony that he paid counsel $15,000 to defend his criminal cases and gave $8,118 to various charities as part of his April 2019 agreement with Defendant.

77. The Court therefore awards Plaintiffs an additional **$23,118** in economic damages.

78. Finally, "compensatory damages may be awarded for humiliation and emotional distress established by testimony or inferred from the circumstances, whether or not plaintiffs submit evidence of economic loss or mental or physical symptoms." *Johnson v. Hale*, 13 F.3d 1351, 1352–53 (9th Cir. 1994) (citations omitted); *accord Smith v. City of Oakland*, 538 F. Supp. 2d 1217, 1240 (N.D. Cal. 2008), *aff'd*, 379 F. App'x 647 (9th Cir. 2010). In the Ninth Circuit, "[t]he testimony of the plaintiff alone can substantiate [the factfinder's] award of emotional distress damages." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1029 (9th Cir. 2008).

79. Here, Plaintiff Ammari testified as to the emotional distress, embarrassment, and impairment of reputation and goodwill he suffered as a result of the seizure of the Trailers and the criminal prosecutions Defendant initiated against him.

80. Emotional distress is "subjective, and the determination of the amount of damages by the trier of fact is equally subjective. There is no fixed standard to determine the amount of noneconomic damages. Instead, the determination is committed to the discretion of the trier of fact." *Corenbaum v. Lampkin*, 215 Cal. App. 4th 1308, 1332 (2013), *as modified* (May 13, 2013) (citations omitted).

81. Having considered the emotional distress Plaintiff Ammari suffered as a result of Defendant's actions, the Court awards an additional **$200,000** in compensatory damages to Plaintiff Ammari.

## V. ORDER

For the reasons set forth above, the Court hereby rules that Plaintiffs Hit & Miss Enterprises, Inc. and Sami Ammari have prevailed against Defendant City of Long Beach on their 42 U.S.C. § 1983 claim for violation of the First Amendment. Plaintiffs Hit & Miss Enterprises, Inc. and Sami Ammari shall have judgment in their favor and against defendant City of Long Beach, and shall recover damages of $292,418.

Finally, consistent with this Order, the Court finds that Plaintiffs are entitled to an award of reasonable attorney's fees and costs. Accordingly, counsel for both parties shall meet and confer in person within 21 days to agree upon a reasonable attorney's fee award, if possible. If not, Plaintiff may file a motion for fees within 60 days from the date of this Order.

**IT IS SO ORDERED.**

Dated: August 5, 2024

HON. WESLEY L. HSU
UNITED STATES DISTRICT JUDGE